COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-430-CR

 

 

SHANNON DARELL DAVIS                                                    APPELLANT



A/K/A
SHANNON D. DAVIS

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Appellant Shannon Darell
Davis a/k/a Shannon D. Davis appeals his conviction for capital murder.  We affirm.








On September 20, 2005,
appellant and four others set out to rob a drug dealer in his east Fort Worth
apartment.  Three of the robbers,
including appellant, carried loaded guns, and during the course of the robbery
they shot two victims, one fatally, Hilda Herrera.  Following a two-day trial, a jury convicted
appellant of capital murder, and the trial court sentenced him to life
imprisonment.[2]


In his first issue, appellant
contends that the trial court erred in allowing a jury verdict that did not
require the jury to agree unanimously on one of the State=s two theories of criminal liability. 
The jury was charged on two theories of capital murder: that appellant
was the one who actually shot and killed the victim and that appellant was
guilty under the law of parties.[3]  Appellant argues that the evidence precludes
him from being the shooter who killed Herrera. 








Appellate review of error in
a jury charge involves a two-step process.[4]  First, we must determine whether error
occurred.[5]  If so, we must then evaluate whether
sufficient harm resulted from the error to require reversal.[6]









The Texas Constitution
requires a unanimous verdict in all felony cases.[7]  The unanimity requirement, however, is not
violated by instructing the jury on alternative theories of committing the same
offense.[8]  For example, jury unanimity on a defendant=s liability as a principal or as a party[9]
to capital murder is not required as long as the jury unanimously agrees that
the defendant committed the offense of capital murder.[10]  When the evidence is insufficient to support
both primary and party theories of liability, however, the trial court errs by
instructing the jury that it may convict the defendant either as a principal or
as a party.[11]


The evidence at trial showed
as follows:

On September 20, 2005,
Brianna Owens and David Bilbo conceived a plan to rob a drug dealer that Owens
knew named Lamont Brown.  Bilbo recruited
three of his roommates and friendsCChristopher Wright, Michael Bowers, and appellantCto help with the robbery.[12]  The group planned that Owens and Bilbo would
approach the apartment, Owens would introduce Bilbo as a potential buyer, and
Bilbo would signal for Wright, Bowers, and appellant to enter and rob Brown. 








Owens and Bilbo drove to
Brown=s apartment in one vehicle, and Wright, Bowers, and appellant followed
them in another.  Bowers testified that
there were four firearms in the second vehicle.  Bowers initially had a .380 caliber gun, but
he discovered that it was unloaded, and appellant gave him a loaded .22 caliber
gun as a replacement.  Wright carried a
.25 caliber gun, and appellant carried a different .380 caliber gun.  Bowers left the unloaded .380 caliber gun in
the car. 

According to the plan, Owens
and Bilbo approached Brown=s garage apartment, entered, and spoke to Brown and Herrera, Brown=s wife.  At some point, Bilbo
left the apartment, purportedly to retrieve a scale from his vehicle.  Bowers, Wright, and appellant then walked up
to the apartment, Herrera let them in, and Owens ran out. 








Bowers was the only person
inside the apartment at the time of the killing who testified at trial.  Once the assailants entered, Wright hit
Herrera, and appellant held Brown at gunpoint while Bowers searched Brown=s pockets and the kitchen for money and drugs.  The robbers demanded to know where the safe
was, and, when Herrera and Brown said they did not know, appellant shot Brown Afour or five times@ and Wright shot Herrera.[13]  Before leaving, Bowers also shot Herrera
once, aiming for her head and intending to kill her.  After Wright and Bowers left the apartment,
Bowers heard a final shot, and then appellant emerged as well.  

The medical and ballistics evidence
corroborated Bowers=s
testimony.  Herrera sustained four
gunshot wounds, two of which were fatal.[14]  The two fatal shots hit Herrera in the head,
both entering near her left ear.  A
third, nonfatal shot entered near the left part of Herrera=s jaw.[15]  A fourth shot, also nonfatal, struck Herrera=s left shoulder, traveled through, and exited her body. 

An examination of the three
bullets recovered from Herrera=s body during the autopsy revealed that the two fatal shots were from
a .25 caliber and a .22 caliber firearm. 
The third bullet, corresponding to the nonfatal jaw injury, was a .380
caliber.  The bullet creating the
nonfatal shoulder injury was not found; the injury appeared consistent with a
larger caliber bullet, but the caliber could not be determined with certainty. 








The police found several
other fired bullets and cartridge casings in and around the apartment.  In the kitchen area, where Bowers testified
that appellant held and shot Brown, there was a large pool of blood, four .380
caliber cartridge casings, and two .380 caliber fired bullets.  The two .380 caliber bullets from the kitchen
had been fired from the same weapon as the .380 caliber bullet found in Herrera=s jaw.[16]  Further, two additional .380 caliber
cartridge casings were found outside of the apartment; these two casings had
been fired from a different weapon than the four .380 caliber casings found in
the kitchen, suggesting the possibility of a fourth weapon.  Finally, unfired ammunition, including .380
caliber, was found in a box, a magazine, and a bank bag in the victims= apartment. 








In reviewing this evidence
for the purpose of evaluating appellant=s jury unanimity complaint, we conclude that it is insufficient to
prove that appellant was guilty of capital murder as a principal.[17]  Herrera was killed by two shots to the head,
one from a .22 caliber firearm and the other from a .25 caliber firearm.  Those were the weapons carried by two of the
other robbers.  The only weapon
associated with appellant was a .380 caliber, and that weapon caused at most
two nonfatal wounds to Herrera (and, possibly, other injuries to Brown).  The prosecutor conceded as much in closing
argument when, referring to the shot from the .380 caliber weapon that hit
Herrera in the jaw, he said, AWas it the death shot?  No,
probably not.  [The medical examiner]
didn=t think so.  But does it show
what his intent was, to kill? 
Absolutely.@  Therefore, the trial court erred by
submitting both principal and party theories of capital murder to the jury.[18]  

We must next determine
whether appellant was harmed by this error.[19]  Appellant concedes that he failed to make a
jury‑unanimity objection in the trial court.  We, therefore, review the error for Aegregious harm.@[20] 








In determining whether
egregious harm occurred, Athe actual
degree of harm must be assayed in light of the entire jury charge, the state of
the evidence, including the contested issues and weight of probative evidence,
the argument of counsel and any other relevant information revealed by the
record of the trial as a whole.@[21]  The purpose of this review is
to illuminate the actual, not just theoretical, harm to the accused.[22]  Egregious harm is a difficult standard to
prove and must be determined on a case-by-case basis.[23]









The evidence supporting
appellant=s
responsibility for capital murder as a party was strong.  While Bowers and Owens were impeached with
their criminal records, plea bargains, and prior inconsistent statements, their
testimony was consistent with each other=s and was corroborated by ballistics evidence and appellant=s admissions.  Appellant told
Christy Ray, an ex-girlfriend, that he robbed a Adope house@ with
Wright, Bowers, and Owens, and that Wright had shot and killed a girl during
the robbery.  He further told Ray details
that matched Owens=s and Bowers=s testimony, such as that the robbery was a Aset up,@ Owens was
supposed to run out of the room, and the robbers got some marijuana from the
victims.  Mikel McConnell, who lived with
Ray, also overheard appellant and Bowers discussing an aggravated robbery that
they committed with Wright, Bilbo, and Owens. 
In addition, McConnell witnessed appellant hide from detectives who came
to Ray=s apartment to investigate appellant, and McConnell saw appellant with
a small gun that looked like a .25 caliber.[24]


The State=s closing argument focused on appellant=s responsibility as a party to the capital murder.  Although appellant presented an alibi
defense,[25]
his attorney admitted in closing, Aif you don=t believe
his [alibi witness] . . . then he was there.@  The jury was free to accept or
reject all or part of appellant=s defensive evidence, and by its verdict apparently disbelieved his
alibi.[26]  Additionally, the jury refused to convict
appellant merely of the lesser included offense of aggravated assault with a
deadly weapon. 








After carefully considering
the entire jury charge, the evidence, the argument of counsel, and other
relevant information, we hold that the error in submitting the theory of
primary liability in addition to party liability did not deny appellant a Afair and impartial trial@ or Aaffect the
very basis of the case, deprive the defendant of a valuable right, or vitally
affect a defensive theory.@[27]  Accordingly, we hold that
appellant did not suffer egregious harm, and we overrule his first issue.

In his second issue,
appellant contends that the trial court erred in failing to investigate his
written complaints to the trial court that his appointed counsel was not
providing adequate representation, resulting in a violation of appellant=s Sixth Amendment right to effective assistance of court-appointed
counsel.[28]


Appellant sent two letters
complaining of his appointed attorney. 
In the first letter, dated approximately four months before trial,
appellant alleged among other things Aa lack of communicating@ and Ainadequate
and unreasonable counseling.@  In the second letter, dated
approximately one month before trial, he attempted to reinstate his previous
complaints against his attorney, which he indicated had been withdrawn,
asserting for example, AI have
neither met with my counsel to discuss my case or his defense tactics,@ AI [am] seeking
to dismiss counsel on grounds of failing to show interest in my case or
familiarize himself with my case,@ and AThere hasn=t been [any] communication between myself and [trial counsel].@  Appellant contends that the
trial court took no action in response to either letter. 








Appellant concedes that under
Texas law he cannot complain on appeal of the trial court=s failure to investigate his requests for a substitute court-appointed
attorney, unless he requested a hearing before the trial court and obtained a
ruling on his request for a new attorney.[29]  Citing federal cases, appellant argues that
Texas law in this regard is inconsistent with the Sixth Amendment of the United
States Constitution.[30]









As an intermediate appellate
court, we are bound by controlling decisions of the Texas Court of Criminal
Appeals.[31]  That court has determined that once a trial
court appoints an attorney to represent an indigent defendant, the defendant
has been afforded all the constitutional protections regarding counsel provided
for under the Sixth and Fourteenth Amendments, and the Constitution imposes no
duty on a trial court to sua sponte hold a hearing and assess trial counsel=s effectiveness every time a criminal defendant expresses
dissatisfaction.[32]
 Even assuming appellant brought his
complaints to the trial court=s attention, he neither requested a hearing nor otherwise attempted to
make a record to support his contentions.[33]  Therefore, no error is presented for our
review.[34]  We overrule appellant=s second issue.  

Having overruled appellant=s issues, we affirm the trial court=s judgment.

 

PER CURIAM

PANEL A: 
CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

DO NOT PUBLISH        

Tex. R. App. P. 47.2(b)

DELIVERED: 
February 28, 2008     

 











[1]See Tex. R. App. P. 47.4.





[2]The
State did not seek the death penalty. 





[3]The
jury charge, in pertinent part, stated, 

 

Now,
if you find from the evidence beyond a reasonable doubt that on or about the 20th
day of September, 2005, in Tarrant County, Texas that the Defendant, Shannon
Darell Davis, did intentionally cause the death of an individual, Hilda
Herrera, by shooting her with a firearm, and the said Defendant was then and
there in the course of committing or attempting to commit the offense of
robbery, or that the Defendant, Shannon Darell Davis, acting with the intent to
promote or assist in the commission of the offense of capital murder,
solicited, encouraged, directed, aided or attempted to aid Michael Bowers or
Christopher Wright to commit the offense of capital murder, then you will find
the Defendant guilty of capital murder as charged in the indictment. 

 

The
trial court also charged the jury on the lesser included offense of aggravated
assault with a deadly weapon (again both as primary actor for that offense and
as a party). 





[4]Abdnor
v. State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).





[5]Id.





[6]Id. at
731B32.





[7]Tex. Const. art. V, ' 13; Stuhler
v. State, 218 S.W.3d 706, 716 (Tex. Crim. App. 2007).





[8]E.g.,
Martinez v. State, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004) (holding
prosecutor=s
argument that jury need only agree that appellant was guilty of capital murder,
but need not agree whether he committed the murder in the course of committing
or attempting to commit robbery or aggravated sexual assault, was proper); Francis
v. State, 36 S.W.3d 121, 124 (Tex. Crim. App. 2000).  





[9]A
person is criminally responsible as a party to an offense if the offense is
committed by his own conduct, by the conduct of another for which he is
criminally responsible, or by both.  Tex. Penal Code Ann. '
7.01(a) (Vernon 2003).  A person is
criminally responsible for an offense committed by the conduct of another if,
acting with intent to promote or assist the commission of the offense, he
solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense.  Id. '
7.02(a)(2) (Vernon 2003).  Each party to
an offense may be charged with commission of the offense.  Id. '
7.01(b).





[10]Toluao
v. State, No. 02-04-00040-CR, 2005 WL 1994179, at *3
(Tex. App.CFort
Worth Aug. 18, 2005, pet. ref=d) (mem. op., not designated
for publication).





[11]Id.; see
also Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (AIt is
appropriate where the alternative theories of committing the same offense are
submitted to the jury in the disjunctive for the jury to return a general
verdict if the evidence is sufficient to support a finding under any of the
theories submitted.@), cert.
denied, 504 U.S. 958 (1992). 





[12]Several
of these individuals had nicknames that appear throughout the record: appellant
was known as ARedrum@ (Amurder@
spelled backwards) and AIceberg@;
Bilbo was known as AYC@; and
Brown was known as AChongo.@ 





[13]Brown
survived but did not testify at trial.  





[14]The
medical examiner could not determine the order of the injuries.  





[15]The
medical examiner discussed the fatality of the third gunshot wound to the jaw
as follows: AWell,
it=s
potentially of concern as far as the fatality is concerned, but it by itself is
not.  Without treatment or medical care,
it may have a lot of complications, but it was not an acutely fatal gunshot
wound.@  





[16]It
was not possible, however, to compare the casings to the bullets to determine
whether they had been shot from the same weapon.





[17]See
Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)
(setting out legal sufficiency standard of review).





[18]See
Toluao, 2005 WL 1994179, at *3.





[19]See
Abdnor, 871 S.W.2d at 731B32.





[20]See
Stuhler, 218 S.W.3d at 713B14; Abdnor, 871 S.W.2d
at 732.





[21]Almanza
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op.
on reh=g); see
also Hutch v. State, 922 S.W.2d 166, 172B74 (Tex. Crim. App. 1996).





[22]Almanza, 686
S.W.2d at 174.





[23]Ellison
v. State, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); Hutch,
922 S.W.2d at 171.





[24]Appellant
also asked McConnell to throw away a pair of his shoes, even though it did not
appear to McConnell there was anything wrong with the shoes. 





[25]Appellant=s
defensive theory was that he was not present. 
His mother testified that appellant was at her home in Watauga at the
time of the killing.





[26]See
Saxton v. State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).





[27]See
Hutch, 922 S.W.2d at 171B72 (citations and internal
quotation marks omitted).





[28]Appellant
does not contend that his attorney=s performance at trial was
deficient. 





[29]Carroll
v. State, 176 S.W.3d 249, 256 (Tex. App.CHouston
[1st Dist.] 2004, pet. ref=d); see also Corona v.
State, Nos. 04-02-00861-CR, 04-02-00862-CR, 2004 WL 56922, at *1B2
(Tex. App.CSan
Antonio Jan. 14, 2004, pet. ref=d) (mem. op., not designated
for publication) (holding trial court had no obligation to initiate an inquiry
where appellant=s
motion to dismiss merely alleged his attorney was not adequately preparing for
trial and was no longer trusted).





[30]See,
e.g., United States v. Young, 482 F.2d 993, 995 (5th Cir. 1973).





[31]Wiley
v. State, 112 S.W.3d 173, 175 (Tex. App.CFort
Worth 2003, pet. ref=d).





[32]Malcom
v. State, 628 S.W.2d 790, 792 (Tex. Crim. App. [Panel
Op.] 1982).





[33]See
Hill v. State, 686 S.W.2d 184, 187 (Tex. Crim. App. 1985); Sexton
v. State, Nos. 02-06-00040-CR, 02-06-00041-CR, 2007 WL 439107, at *2 (Tex.
App.CFort
Worth Feb. 8, 2007, pet. ref=d) (mem. op., not designated
for publication).





[34]Hill, 686
S.W.2d at 187; Sexton, 2007 WL 439107, at *2.